**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES EVERETT SHELTON, individually, and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> COMCAST CORPORATION and COMCAST CABLE COMMUNICATIONS, LLC, <br><br> Defendants. | Civil Action No. 2:20-cv-01763 <br> Hon. Nitza I. Quiñones Alejandro |

**[PROPOSED] ORDER**

**AND NOW**, this    day of          , 2020, upon consideration of Defendants Comcast Corporation and Comcast Cable Communications, LLC's (collectively, "Comcast") Motion to Compel Arbitration and Stay Litigation, it is hereby **ORDERED**, that Defendant Comcast's Motion to Compel Arbitration and Stay Litigation is **GRANTED**.

**BY THE COURT**:

_____
Hon. Nitza I. Quiñones Alejandro

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES EVERETT SHELTON, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COMCAST CORPORATION and COMCAST CABLE COMMUNICATIONS, LLC,<br><br>Defendants. | Civil Action No. 2:20-cv-01763<br>Hon. Nitza I. Quiñones Alejandro |

### DEFENDANTS COMCAST CORPORATION AND COMCAST CABLE COMMUNICATIONS, LLC'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

Defendants Comcast Corporation and Comcast Cable Communications, LLC (collectively, "Comcast") hereby move this Court to compel Plaintiff James Everett Shelton to submit his claims to individual arbitration and stay these proceedings pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–16.  In support of this Motion, Comcast relies on its Memorandum of Law in Support of Motion to Compel Arbitration and Stay Litigation and other documents on file with the Court and cited in the Memorandum.

*/s/ Seamus C. Duffy*
Seamus C. Duffy (ID No. 52501)
Julie A. Busta (ID. No. 311933)
Akin Gump Strauss Hauer & Feld LLP
Two Commerce Square
2001 Market St., Suite 4100
Philadelphia, PA 19103
Tel: 215-965-1200
Fax: 215-965-1210
sduffy@akingump.com
jbusta@akingump.com

Attorneys for Defendants
Comcast Corporation and Comcast Cable
Communications, LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES EVERETT SHELTON, individually, and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> COMCAST CORPORATION and COMCAST CABLE COMMUNICATIONS, LLC, <br><br> Defendants. | Civil Action No. 2:20-cv-01763 <br><br> Hon. Nitza I. Quiñones Alejandro |

## DEFENDANTS COMCAST CORPORATION AND COMCAST CABLE COMMUNICATIONS, LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

# TABLE OF CONTENTS

**Page**

I.     **INTRODUCTION**................................................................................................1

II.    **BACKGROUND** ................................................................................................3

    A.     **The Shelton Home Account**................................................................3

    B.     **Plaintiff's Use and Control of Services Under the Shelton Home Account** ................................................................................................4

    C.     **The Arbitration Provision in the Subscriber Agreement** .................7

    D.     **Plaintiff's Untimely Opt Out and Creation of a Fake Account** ......10

III.   **ARGUMENT**....................................................................................................11

    A.     **The Federal Arbitration Act and the Presumption of Arbitrability**................11

    B.     **Plaintiff Should Be Compelled to Arbitrate His Claim** .................13

         1.     **Plaintiff Accepted and Is Bound by the Subscriber Agreement by Using the Services.** .................................................14

         2.     **Plaintiff is Equitably Estopped From Evading the Arbitration Provision.** ................................................16

IV.   **CONCLUSION** ...............................................................................................18

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Bruce Terminix Cos. v. Dobson*,
   513 U.S. 265 (1995)......................................................................................................12

*Armendariz v. Ace Cash Express*,
   No. 13-0590, 2013 WL 3791438 (D. Or. July 19, 2013).......................................18

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011)......................................................................................................11

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
   475 U.S. 643 (1986)................................................................................................12, 13

*BNY Licensing Corp. v. Isetan of Am. Inc.*,
   206 B.R. 336 (Bankr. S.D.N.Y. 1997).....................................................................18

*Caley v. Gulfstream Aerospace Corp.*,
   428 F.3d 1359 (11th Cir. 2005) .................................................................................15

*Chassen v. Fid. Nat'l Fin. Inc.*,
   836 F.3d 291 (3d Cir. 2016)........................................................................................12

*Dean Witter Reynolds, Inc. v. Byrd*,
   470 U.S. 213 (1985)......................................................................................................11

*Doyle v. Merrick Bank Corp.*,
   No. 17-2430, Dkt. 1 (E.D. Pa. May 30, 2017) ........................................................10

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018)..................................................................................................11

*G.T.G. Constr. Co. v. Goel Servs., Inc.*,
   No. 12-1129, 2012 WL 3860590 (D.D.C. Sept. 5, 2012).......................................18

*Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991).......................................................................................................11

*Griswold v. Coventry First LLC*,
   762 F.3d 264 (3d Cir. 2014)...........................................................................16, 17, 18

*HealthplanCRM, LLC v. AvMed, Inc.*,
   No. 19-1357, 2020 WL 2028261 (W.D. Pa. Apr. 28, 2020).......................16, 17, 18

ii

*Intec USA, LLC v. Engle*,
No. 05-0468, 2006 WL 753180 (M.D.N.C. Mar. 23, 2006)....................................................18

*Intravascular Research Ltd. V. Endosonics Corp.*,
994 F. Supp. 564 (D. Del. 1998)...........................................................................................18

*Invista S.A.R.L. v. Rhodia, S.A.*,
625 F.3d 75 (3d Cir. 2010)..............................................................................................16, 17

*Mey v. DirecTV, LLC*,
No. 17-cv-179, Dkt. No. 151 (N.D. W. Va. Dec. 11, 2017).....................................................2

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985)............................................................................................................11

*Montoya v. Comcast Corp.*,
No. 15-02573, 2016 WL 5340651 (E.D. Cal. Sept. 23, 2016) .........................................17, 18

*Morina v. Neiman Marcus Grp., Inc.*,
No. 14-1394, 2014 WL 4933022 (E.D. Pa. Oct. 1, 2014) ......................................................15

*Moses H. Cone Mem'l Hosp. v. Mercury Contr. Corp.*,
460 U.S. 1 (1983)..........................................................................................................12, 14

*Nationwide Mut. Fire Ins. Co. v. Geo. V. Hamilton, Inc.*,
410 F. App'x 537 (3d Cir. 2011) ..........................................................................................12

*Nicosia v. Amazon.com, Inc.*,
384 F. Supp. 3d 254 (E.D.N.Y. 2019) ...................................................................................18

*O'Neil v. Comcast Corp.*,
No. 18-4249, 2019 WL 952141 (N.D. Ill. Feb. 27, 2019) ................................................13, 15

*Perry v. Thomas*,
482 U.S. 483 (1987)............................................................................................................11

*Schwartz v. Comcast Corp.*,
256 F. App'x 515 (3d Cir. 2007) ......................................................................................15, 16

*Shelton v. Capital Advances LLC*,
No. 18-cv-2186 (E.D. Pa. May 24, 2018) ..................................................................................4

*Shelton v. Centerpointe Lending Student Loan Services*,
No. 18-cv-1655 (E.D. Pa. Apr. 19, 2018) ..................................................................................4

*Shelton v. Fast Advance Funding, LLC*,
No. 18-cv-2071 (E.D. Pa. May 17, 2018) ..................................................................................4

*Shelton v. Ivest360, LLC*,
No. 18-cv-2759 (E.D. Pa. June 28, 2018)................................................................4

*Shelton v. Merchant Flow Financial Corp.*,
No. 18-cv-11294 (D.N.J. June 25, 2018)...............................................................4

*Shelton v. Paramount Holding Company, LLC*,
No. 18-cv-2072 (E.D. Pa. May 17, 2018)..............................................................4

*Shelton v. Pivotal Payment Systems, Inc.*,
No. 18-cv-9915 (D.N.J. May 30, 2018)..................................................................4

*Shelton v. RFR Capital LLC*,
No. 18-cv-2259 (E.D. Pa. May 30, 2018)..............................................................4

*Shelton v. Target Advance LLC*,
No. 18-2070, 2019 WL 1641353 (E.D. Pa. Apr. 16, 2019)...................................5

*Stoops v. Wells Fargo Bank, N.A.*,
197 F. Supp. 3d 782 (W.D. Pa. 2016)...................................................................2

*Strange v. Comcast Corp.*,
No. 18-4032, 2018 WL 6602072 (E.D. Pa. Dec. 14, 2018)...........................13, 15

**Statutes**

9 U.S.C. § 2....................................................................................................................12, 15

9 U.S.C. § 3...........................................................................................................................14

9 U.S.C. § 4...........................................................................................................................14

**Other Authorities**

Restatement (Second) of Contracts § 23.................................................................................15

Defendants Comcast Corporation and Comcast Cable Communications, LLC (collectively, "Comcast")[1] submit this memorandum of law in support of their Motion to Compel Arbitration and Stay Litigation pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16.[2]

## I.     INTRODUCTION

Plaintiff James Everett Shelton ("Plaintiff") is infamous in this District as a serial litigant who attempts to manufacture Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA") actions by baiting unsuspecting companies to place calls to him.  True to form, Plaintiff employed the same unscrupulous tactics in this matter.  Comcast records indicate that in an effort to bait Comcast, Plaintiff placed a call to Comcast on June 22, 2018, and then hung up to disconnect the call.  As a result of disconnecting the call, Plaintiff intentionally set in motion a series of events that led to the filing of this lawsuit.  Specifically, when Plaintiff hung up the call he initiated to Comcast on June 22, 2018, a Comcast representative was prompted to call him back.  During the call back phone call, Plaintiff then placed an order for Comcast internet and cable services to his home on Covered Bridge Road in King of Prussia, PA (the "Shelton Home"), where Plaintiff resides and operates a business called Final Verdict Solutions.

At the time of his call, however, the Shelton Home was already receiving Comcast cable and internet service, and had been since 2006—a fact personally known to Plaintiff from his long use and enjoyment of those services and his repeated interactions with Comcast regarding them.  Thus, following Plaintiff's initial June 22 call, Comcast contacted him to inquire about the order

---

[1] Comcast's motion is subject to and without waiver of its argument that Comcast Corporation is not an appropriate defendant in this action.  Comcast Corporation is a holding company, not an operating company, and is therefore not involved in the day-to-day management of its operating subsidiaries, including Comcast Cable Communications, LLC.

[2] By this Motion, Comcast does not waive any defenses, objections or motions under applicable state or federal law.

for duplicative service at the Shelton Home, prompting Plaintiff to change the service order from

the Shelton Home to a fake address owned by another TCPA litigant.  Immediately after confirming

with Comcast the order and the installation date, Plaintiff canceled the order.  Two years later,

Plaintiff filed this putative class action under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et*

*seq.* ("FCRA").

The events of June 22 are disturbing to say the least, and all too familiar for Plaintiff, whose

"business model" consists of intentionally opening then immediately canceling service accounts

in order to bait follow-up calls from the service provider to manufacture putative TCPA claims.

*See Mey v. DirecTV, LLC*, No. 17-cv-179, Dkt. No. 151 (N.D. W. Va. Dec. 11, 2017) (Plaintiff

joining putative class action as a plaintiff and alleging he intentionally opened and canceled two

DirecTV accounts, also in June 2018).  In circumstances like these, where a person intentionally

places himself in a position to experience the loss of a statutory right and seeks to provoke the very

harm the statute is designed to prevent, there is a serious question whether such a person has Article

III standing.  *See Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782 (W.D. Pa. 2016).  This

brand of "litigation for profit" drains the resources of the federal judiciary and the companies that

it unfairly targets.

Whatever may be said as to Plaintiff's standing and the merits of the manufactured claims

he asserts, he is bound to resolve them not in litigation, but rather in arbitration, as specified in the

Comcast Agreement for Residential Services ("Subscriber Agreement") that governs the services

he has used for years at the Shelton Home.  The Subscriber Agreement expressly governs all who

use the service, including Plaintiff, and he is equitably estopped from asserting otherwise as to the

claims he alleges here.  Because Plaintiff's claims fall squarely within the broad scope of the

arbitration provision, the Court should compel Plaintiff to individual arbitration and stay this action pending resolution of that proceeding.

## II.     BACKGROUND

### A.     The Shelton Home Account

On or about September 24, 2006, a Comcast account (the "Shelton Home Account") was opened for cable and internet services provided at the Shelton Home, where Plaintiff resides with his parents.  *See* Decl. of Nicole Patel ("Patel Decl.") ¶ 4 (identifying Shelton Home Account); Decl. of Julie Busta ("Busta Decl.") ¶¶ 2-3, Ex. A (attaching public records identifying Plaintiff as residing at the Shelton Home with his parents).  The nominal accountholder for the Shelton Home Account is Plaintiff's father, and Plaintiff and his mother are likewise associated with the Shelton Home Account.  *See* Patel Decl. ¶ 5 (identifying the Shelton Home Account as being opened by Plaintiff's father and identifying Plaintiff's mother and Plaintiff as associated with the account); Busta Decl. ¶¶ 2-3, Ex. A (identifying Plaintiff as residing at the Shelton Home with his parents, the other people identified in Comcast's records as being associated with the Shelton Home Account).[3]

As a matter of routine business practice, subscribers such as those in the Shelton Home who initiate service with Comcast receive a copy of the Subscriber Agreement at the start of service.  *See* Decl. of Ann Marie Miriello ("Miriello Decl.") ¶ 4 (attaching Subscriber Agreement in effect when service was initiated at the Shelton Home ("2006 Subscriber Agreement") as Ex. A).  As permitted by its terms, the 2006 Subscriber Agreement was updated numerous times,

---

[3] In accordance with the federal Cable Act, 47 U.S.C. 551(c), Federal Rule of Civil Procedure 5.2(a), and Local Rule 5.1.3, Comcast has redacted names and addresses and other identifying and account information relied on in connection with this motion.  To the extent the Court requests unredacted information, Comcast is prepared to and will promptly make any such information available to the Court.

3

including in 2017, when Comcast most recently mailed an updated version of the Subscriber **Agreement** to the Shelton Home. *Id.*, ¶ 9 (attaching Subscriber Agreement mailed to the Shelton Home in 2017 (the "2017 Subscriber Agreement") as Ex. C). The Subscriber Agreement is also made available for subscribers online. *Id.*, ¶ 10 (confirming that the Subscriber Agreement is available online at https://www.xfinity.com/corporate/customers/policies/subscriberagreement).

The Subscriber Agreement expressly binds all members of the Shelton Home using Comcast's services. *See id.*, Ex. C § 1 ("**You will have accepted this Agreement and be bound by its terms if you use the Services**…." (emphasis in original)); *see also id.* at § 7 ("[Y]ou are accepting this Agreement on behalf of all persons who use the Xfinity Equipment and/or Service(s) at the Premises … and you shall have sole responsibility for ensuring that all other users understand and comply with the terms and conditions of this Agreement and any applicable policies…" (emphasis added)).

### B. Plaintiff's Use and Control of Services Under the Shelton Home Account

Plaintiff has resided at the Shelton Home at all times relevant to this action.[4] Further, as reflected in Comcast's business records, Plaintiff's wireless telephone number (xxx) xxx-3942 was provided to Comcast and has been maintained as a contact number for communicating with the

---

[4] Indeed, Plaintiff listed the Shelton Home as his address in nine *pro se* filings from April 2018 through June 2018. *See Shelton v. Centerpointe Lending Student Loan Services*, No. 18-cv-1655 (E.D. Pa. Apr. 19, 2018); *Shelton v. Paramount Holding Company, LLC*, No. 18-cv-2072 (E.D. Pa. May 17, 2018); *Shelton v. Target Advance LLC*, No. 18-cv-2070 (E.D. Pa. May 17, 2018); *Shelton v. Fast Advance Funding, LLC*, No. 18-cv-2071 (E.D. Pa. May 17, 2018); *Shelton v. Capital Advances LLC*, No. 18-cv-2186 (E.D. Pa. May 24, 2018); *Shelton v. Pivotal Payment Systems, Inc.*, No. 18-cv-9915 (D.N.J. May 30, 2018); *Shelton v. RFR Capital LLC*, No. 18-cv-2259 (E.D. Pa. May 30, 2018); *Shelton v. Merchant Flow Financial Corp.*, No. 18-cv-11294 (D.N.J. June 25, 2018); *Shelton v. Ivest360, LLC*, No. 18-cv-2759 (E.D. Pa. June 28, 2018).

Shelton Home regarding service provided under the Shelton Home Account.[5]  *See* Patel Decl. ¶ 5; Busta Decl. ¶ 2.

Not only does Plaintiff reside at the Shelton Home, he also has operated a business, Final Verdict Solutions, from the Shelton Home since March 7, 2016.  *See* Busta Decl. ¶ 6, Ex. C. Plaintiff advertises Final Verdict Solutions as a "professional judgment recovery business," but as this Court has previously noted, "the record suggests that Final Verdict Solutions has the sole purpose of luring business-to-business telemarketers (such as Defendant) into calling the Phone Number, which is held out to the world as a business telephone number, so that Plaintiff can bring TCPA actions against the telemarketers who call him."  *Shelton v. Target Advance LLC*, No. 18-2070, 2019 WL 1641353, at *5 (E.D. Pa. Apr. 16, 2019) (Quiñones, J.).

In addition to using Comcast services while residing in and running a business from the Shelton Home, Plaintiff actively controls the Shelton Home Account.  A service call regarding the Shelton Home Account made earlier this year by Plaintiff demonstrates his use of Comcast service as contemplated by the Subscriber Agreement and his control over the account.  *See* Busta Decl. ¶ 7, Ex. D (attaching certified transcript of a service call made by Plaintiff on January 29, 2020 regarding the Shelton Home Account, and maintained by Comcast in the ordinary course of its business).

---

[5] As set forth in the Subscriber Agreement at Section 14(c)(ii), subscribers "represent and warrant that [they] have provided us with information *that is accurate, complete and current*, including without limitation [their] legal name, address, *telephone number(s)*, the number of devices on which or through the Service(s) is being used, and payment data (including without limitation information provided when authorizing recurring payments)." Miriello Decl., Ex. C (emphasis added).  Under Section 14(d), Plaintiff further "agree[s] that Comcast or third parties acting on Comcast's behalf may call or text you at any telephone number that you provide to Comcast or that Comcast issues to you, and may do so for any purpose..." *Id.*

"This is f████ing bull███t."  *Id.* at 5:11-12 (JAMES SHELTON).  Exploiting the benefits afforded him as a user of Comcast services, Plaintiff called Comcast on the morning of January 29, 2020 to seek assistance in accessing programming provided "on the Netflix app," which he complained "doesn't work."  *Id.* at 2:7-9.  As the Comcast service agent, Camille, attempts to navigate Plaintiff's problem for him, Plaintiff confirms that he is accessing Comcast's services from within Comcast's "X1 platform."  *Id.* at 2:16-20 ("CAMILLE: Okay. That's inside, like the – that's inside the X1 platform, right?  JAMES SHELTON: *I click the Xfinity button, go to on demand, then go to Netflix, click that* - -" (emphasis added)).  Plaintiff further confirms that the Shelton Home Account has just "one cable box," *id.* at 3:2-4, and tells the Comcast service representative trying to assist him that its "really inconvenient" for her to ask for his cable box serial number because he assumed Comcast would "have [his] serial number already from [his] phone number[.]"  *Id.* at 3:9-18.  Indeed, after being transferred to "advanced repair," Plaintiff identifies that the television in need of troubleshooting is *his* television, *id.* at 7:13-15, provides *his* 3942 telephone number that is on the account as the appropriate callback number, *id.* at 7:21-25, and confirms that *his* internet service and other applications—including YouTube, Amazon Prime Video and HBO—are all operational, *id.* at 8:4-17.  Finally, Plaintiff acknowledges *that he affirmatively set up his Comcast Xfinity account online* at Comcast's "Xfinity.com"[6] website, and that he knows "where [he] can troubleshoot on [his] Wi-Fi Service."[7]  In short, he confirms his use and enjoyment of the very benefits and services provided to the Shelton Home Account

---

[6] Busta Decl., Ex. D, at 13:8-15 ("KATIE: Okay. Yes, sir. And I would also like to know, sir, if you have set up your account online on Xfinity.com? If you've downloaded the My Account app? JAMES SHELTON: Yeah -- KATIE: You have? All right. *JAMES SHELTON: I set up the account before online.*" (emphasis added)).

[7] *Id.* at 14:5-9 ("Also, I would like to let you know about the Wi-Fi, xFi app. That's where you can troubleshoot on your Wi-Fi service. That's also --JAMES SHELTON: Correct.").

under the Subscriber Agreement.  *See id.* at 15:7-16 ("JAMES SHELTON: ***It's back up.***  So should I go back into Netflix?  KATIE: Oh, if you're getting live channels, yes, you can go to the app.  JAMES SHELTON: Let me see if that works.  ***Looks like it's working now.***  KATIE: It's working?  JAMES SHELTON: Yeah, it looks like it's -- looks like it's coming on.  Let me see here.  ***Yeah.  Think that did the trick.***" (emphasis added)); *id.* at 16:15-18 ("KATIE: You're welcome.  Is there anything else I can assist you with today?  JAMES SHELTON: That's it. Thank you so much.").

### C.     The Arbitration Provision in the Subscriber Agreement

The Shelton Home has been subject to an arbitration provision contained in the Subscriber Agreement since the installation of Comcast services in 2006.  Specifically, on the first page of the 2006 Subscriber Agreement, and in bold type, the 2006 Subscriber Agreement notifies users that it contains a binding arbitration provision.  Miriello Decl. ¶ 5, Ex. A.

The 2017 Subscriber Agreement similarly notifies users—on the first page, and in bold type—that it contains a binding arbitration provision.  *See id.*, ¶ 9, Ex. C.  Then, under the heading "**BINDING ARBITRATION**," the agreement clearly and conspicuously discloses that any "Dispute" must be resolved by arbitration,[8] and it broadly defines such "Dispute[s]" to include "any claim or controversy related to [Comcast] or our relationship."[9]  The agreement also clearly discloses that the binding arbitration clause applies to all "users or beneficiaries of the Xfinity

---

[8] *See id.*, Ex. C § 13(a) ("**Purpose**.  Any Dispute involving you and [Comcast] shall be resolved through individual arbitration.  In arbitration, there is no judge or jury and there is less discovery and appellate review than in court."  (emphasis in original)).

[9] *See id.*, Ex. C § 13(b) ("**Definitions**.  This Arbitration Provision shall be broadly interpreted.  'Dispute' means any claim or controversy related to us or our relationship, including but not limited to any and all: (1) claims for relief and theories of liability, whether based in contract, tort, fraud, negligence, statute, regulation, ordinance, or otherwise; (2) claims that arose before this or any prior Agreement; (3) claims that arise after the expiration or termination of this Agreement, and (4) that are the subject of purported class action litigation."  (emphasis in original)).

Service(s) or Equipment."[10]   The arbitration agreement also specifies that Disputes will be arbitrated on an individual basis[11] and that the obligation to arbitrate "shall survive the termination of [a subscriber's service] with [Comcast]."[12]

The arbitration agreement also contains several provisions that make arbitration less costly and more convenient for subscribers, such as providing access to a convenient forum,[13] permitting subscribers to file suit in small claims court[14] and requiring Comcast to pay for arbitral fees and costs in circumstances involving claims for less than $75,000.[15]

The Subscriber Agreement provides users a right to opt out of arbitration within 30 days of initiating service.  The 2006 Subscriber Agreement did not yet permit subscribers the right to opt

---

[10] *See id.*, Ex. C § 13(b) ("As used in the Arbitration Provision, 'us' means Comcast and any of its predecessors, successors, assigns, parents, subsidiaries, and affiliates, and each of their respective officers, directors, employees and agents, and 'you' means you and any users or beneficiaries of the Xfinity Service(s) or Equipment.").

[11] *See id.*, Ex. C § 13(h) ("**Waiver of Class Actions and Collection Relief**.  THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED OR LITIGATED ON A CLASS ACTION, JOINT OR CONSOLIDATED BASIS OR ON BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC (SUCH AS A PRIVATE ATTORNEY), OTHER SUBSCRIBERS, OR OTHER PERSONS." (emphasis and typography in original)).

[12] *See id.*, Ex. C § 13(j) ("**Survival**.  This Arbitration Provision shall survive the termination of your Service(s) with [Comcast]." (emphasis in original)).

[13] *See id.*, Ex. C § 13(g) ("**Arbitration Procedures**. … Unless you and [Comcast] agree otherwise, any arbitration hearing will take place at a location convenient to you in the area where you receive Service(s) from [Comcast]." (emphasis in original)).

[14] *See id.*, Ex. C § 13(f) ("**Right to Sue in Small Claims Court**.  Notwithstanding anything in this Arbitration Provision to the contrary, either you or we may elect to have an action heard in a small claims court in the area where you receive(d) Service(s) from us if the claim is not aggregated with the claim of any other person and if the amount in controversy is properly within the jurisdiction of the small claims court."  (emphasis in original)).

[15] *See id.*, Ex. C § 13(i) ("**Arbitral Fees and Costs**.  If your claim seeks more than $75,000 in the aggregate, the payment of the AAA's fees and costs will be governed by the AAA rules.  If your claims seek less than $75,000 in the aggregate, the payment of the AAA's fees and costs will be our responsibility."  (emphasis in original)).

out of arbitration, *Id.*, ¶ 4, Ex. A, however, in June 2007, Comcast mailed an Arbitration Notice to the Shelton Home subscribers that provided them with an opt-out opportunity. *Id.*, ¶¶ 6-8, Ex. B. The 2007 Arbitration Notice notified users that it contained an "**IMPORTANT CHANGE**" to the binding arbitration provision by adding a provision to allow subscribers to opt out of arbitration. *See id.*, ¶ 6, Ex. B (emphasis and typography in original). Beneath that heading, the Arbitration Notice states that "**IF YOU DO NOT WISH TO BE BOUND BY THIS ARBITRATION PROVISION, YOU MUST NOTIFY COMCAST IN WRITING WITHIN THIRTY (30) DAYS FROM THE DATE YOU RECEIVE THIS NOTICE…**" *Id.* (emphasis and typography in original). The Notice further stated "**IF YOU DO NOT OPT OUT OF ARBITRATION IN THE MANNER INDICATED ABOVE YOUR CONTINUED USE OF THE SERVICE AFTER THE EFFECTIVE DATE SHALL BE DEEMED TO BE YOU[R] ACCEPTANCE OF THIS CHANGE.**" *Id.* (emphasis and typography in original).[16] Comcast has no record of an

---

[16] The Notice states in full "**THIS NOTICE CONTAINS AN IMPORTANT CHANGE TO YOUR CUSTOMER OR SUBSCRIBER AGREEMENT WITH COMCAST (THE "AGREEMENT"). PLEASE NOTE THAT THIS CHANGE TO THE AGREEMENT AS SET FORTH BELOW RESTATES AND SUPERSEDES ANY PREEXISTING PROVISION IN THE AGREEMENT CONCERNING ARBITRATION AND TAKES EFFECT THIRTY (30) DAYS AFTER THIS NOTICE WAS MAILED TO YOU (THE "EFFECTIVE DATE"). IF YOU DO NOT WISH TO BE BOUND BY THIS ARBITRATION PROVISION, YOU MUST NOTIFY COMCAST IN WRITING WITHIN THIRTY (30) DAYS FROM THE DATE THAT YOU FIRST RECEIVE THIS NOTICE BY VISITING WWW.COMCAST.COM/ARBITRATIONOPTOUT, OR BY MAIL TO COMCAST 1500 MARKET ST., PHILADELPHIA, PA 19102 ATTN: LEGAL DEPARTMENT/ ARBITRATION. YOUR WRITTEN NOTIFICATION TO COMCAST MUST INCLUDE YOUR NAME, ADDRESS AND COMCAST ACCOUNT NUMBER AS WELL AS A CLEAR STATEMENT THAT YOU DO NOT WISH TO RESOLVE DISPUTES WITH COMCAST THROUGH ARBITRATION. …IF YOU DO NOT OPT OUT OF ARBITRATION IN THE MANNER INDICATED ABOVE YOUR CONTINUED USE OF THE SERVICE AFTER THE EFFECTIVE DATE SHALL BE DEEMED TO BE YOU[R] ACCEPTANCE OF THIS CHANGE.  THIS CHANGE MAY HAVE A SUBSTANTIAL IMPACT ON THE WAY IN WHICH YOU OR COMCAST WILL RESOLVE ANY DISPUTE WITH ONE ANOTHER**."

opt-out from the Shelton Home or the Shelton Home Account within 30 days of providing the Arbitration Notice in June 2007 and the Shelton Home continued to receive Comcast services thereafter and still does to this day.  *See* Patel Decl. ¶¶ 7-9.

> **D.      Plaintiff's Untimely Opt Out and Creation of a Fake Account**

On June 22, 2018, Plaintiff called Comcast using his (xxx) xxx-3942 number associated with the Shelton Home Account.  *See* Decl. of Rachel Weinstein ("Weinstein Decl.") ¶ 4. Plaintiff's call was received by a vendor for Comcast.  *See id.*, ¶ 4.  After abruptly disconnecting the call and receiving a call back, Plaintiff placed an order through the vendor for Comcast services for the Shelton Home.  *See id.*, ¶¶ 5-6.  When Comcast subsequently received Plaintiff's order for service from its vendor, Comcast's systems flagged the order as an "active address" order because Comcast already provided service to the Shelton Home through the Shelton Home Account.  *See id.*, ¶¶ 7-8.

On June 25, 2018, Comcast called Plaintiff regarding the "active address" issue.  *See id.*, ¶ 9.  Plaintiff then provided Comcast a new address for service at a residence on Catfish Lane in Norristown, PA and confirmed installation.  *See id.*, ¶ 10-11.  Public records confirm that Plaintiff does not and appears never to have resided at the Catfish Lane address he provided.  Busta Decl. ¶ 4, Ex. A.  Indeed, that home on Catfish Lane belongs to Danon J. Doyle, another *pro se* TCPA litigant.  *See* Busta Decl. ¶  5, Ex. B; *Doyle v. Merrick Bank Corp.*, No. 17-2430, Dkt. 1 (E.D. Pa. May 30, 2017) (*pro se* plaintiff alleging violations of TCPA and listing address on Catfish Lane). Plaintiff then canceled service for the fake account that same day.  *See* Weinstein Decl. ¶ 11.

A month after Plaintiff's cancellation of the fake account, Plaintiff went to Comcast's website and purported to opt out of arbitration for the fake account, listing the Shelton Home as the account address.  *See* Patel Decl. ¶ 14.  Four days later, on July 21, 2018, Plaintiff returned to the Comcast website and purported to opt out of arbitration for the Shelton Home Account, again

using the Shelton Home address.  *See id.*, ¶ 9.  Notwithstanding the **September 2006** service

installation date, and **June 2007** opt-out notification, the attempted opt-out stated falsely that the

Shelton Home first received its Welcome Kit for Comcast services (a kit provided at installation

of a new account) on **July 21, 2018**.  *See id.*, ¶ 9.  Indeed, Comcast has no record of providing a

Welcome Kit to the Shelton Home Account in July 2018, and would not have provided the kit at

that time because the home had been receiving Comcast service since 2006.  *See id.*, ¶ 10.

## III.   ARGUMENT

### A.   The Federal Arbitration Act and the Presumption of Arbitrability

In the FAA, Congress has expressed a strong public policy favoring arbitration.  Indeed,

courts are directed to "rigorously enforce" arbitration agreements.  *Dean Witter Reynolds, Inc. v.

Byrd*, 470 U.S. 213, 221 (1985).  The FAA was enacted to "reverse the longstanding judicial

hostility to arbitration agreements" and to place them on "the same footing as other contracts."

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991); *see also Epic Sys. Corp. v. Lewis*,

138 S. Ct. 1612, 1619 (2018) ("In the [FAA], Congress has instructed federal courts to enforce

arbitration agreements according to their terms."); *AT&T Mobility LLC v. Concepcion*, 563 U.S.

333, 339 (2011) ("[C]ourts must place arbitration agreements on an equal footing with other

contracts…and enforce them according to their terms."); *Perry v. Thomas*, 482 U.S. 483, 489

(1987) (describing the FAA as "'a congressional declaration of liberal federal policy favoring

arbitration agreements'" (citation omitted)); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,

Inc.*, 473 U.S. 614, 631 (1985) (noting the "emphatic federal policy in favor of arbitral dispute

resolution"); *Nationwide Mut. Fire Ins. Co. v. Geo. V. Hamilton, Inc.*, 410 F. App'x 537, 540 (3d

Cir. 2011) ("There is a strong presumption in the federal law favoring arbitration.").

Arbitration agreements must meet only two conditions for the FAA to apply:  (1) they must

be in writing; and (2) they must be part of "a contract evidencing a transaction involving [interstate]

commerce."  9 U.S.C. § 2.  Agreements that satisfy both of those requirements are "valid, irrevocable, and enforceable" under federal law.  *Id.*  Here, the arbitration agreement is both in writing, *see* Miriello Decl., Ex. C, and evidences a transaction in interstate commerce, namely the provision of interstate telecommunications services.  *See, e.g.*, *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273-74 (1995).  Indeed, the Subscriber Agreement states that it is governed by the FAA.  *See* Miriello Decl., Ex. C § 13(g) ("This Arbitration Provision shall be governed by the Federal Arbitration Act.").

Given the strong public policy favoring arbitration, questions concerning the scope or enforceability of an arbitration agreement should be decided "with a healthy regard for the federal policy favoring arbitration," and "any doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Contr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) ("'[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage.'" (citations omitted)); *Chassen v. Fid. Nat'l Fin. Inc.*, 836 F.3d 291, 295 (3d Cir. 2016) ("'[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or any allegation of waiver, delay, or a like defense to arbitrability.'" (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25)).  This presumption is "particularly applicable" where, as here, the arbitration clause is broad.  *AT&T Techs., Inc.*, 475 U.S. at 650.

Here, Plaintiff's claims fall squarely within the scope of the arbitration agreement, which requires individual arbitration of any "Disputes involving you and [Comcast]."  Miriello Decl.,

Ex. C § 13(a).  "Dispute" is broadly defined as, among other things, "any claim or controversy related to us or our relationship, including but not limited to any and all: (1) claims for relief and theories of liability, whether based in contract, tort, fraud, negligence, statute, regulation, ordinance or otherwise; (2) claims that arose before this or any prior Agreement; …and (3) claims that are the subject of purported class action litigation."  *Id.*, Ex. C § 13(b); *see also id.* ("This Arbitration Provision shall be broadly interpreted.").

Plaintiff alleges that Comcast violated the FCRA by checking his credit report without a permissible purpose in June 2018.  *See* Compl. ¶¶ 5–10.  Accordingly, Plaintiff's claims necessarily constitute a "dispute involving [him] and [Comcast]" and are "related to [Comcast]."  Miriello Decl., Ex. C § 13(a)-(b).  Particularly in light of the presumption in favor of arbitrability, there should be no doubt that Plaintiff's claims, which involve "theories of liability…based in contract, tort, fraud, negligence, statute, regulation, ordinance or otherwise" (*id.* Ex. C § 13(b)), must be arbitrated on an individual basis.  *See Strange v. Comcast Corp.*, No. 18-4032, 2018 WL 6602072, at *1 (E.D. Pa. Dec. 14, 2018) (compelling arbitration of TCPA and Sherman Antitrust Act claims *under identical arbitration provisions*) (Quiñones, J.); *accord O'Neil v. Comcast Corp.*, No. 18-4249, 2019 WL 952141, at *4 (N.D. Ill. Feb. 27, 2019) ("However, the arbitration provision is quite broad in scope, including 'any dispute, claim, or controversy *related to us or our relationship*, including but not limited to any and all . . . claims for relief and theories for liability, whether based on contract, tort, fraud, negligence, statute, regulation, ordinance, or otherwise . . .'" (quoting 2017 Subscriber Agreement § 13(b) (emphasis in *O'Neil*))).

### B.    Plaintiff Should Be Compelled to Arbitrate His Claim

When an arbitration agreement is governed by the FAA and a dispute is within the agreement's scope, a court's duty is clear.  It must compel the parties to comply with their arbitration agreement and stay further judicial proceedings.  *See* 9 U.S.C. §§ 3, 4; *see also Moses*

*H. Cone Mem'l Hosp.*, 460 U.S. at 22 ("The [FAA] provides two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4").  Plaintiff is bound to arbitrate under the Subscriber Agreement governing the service at the Shelton Home because he uses Comcast's services there.  In addition, and in the alternative, Plaintiff's use and control of the Shelton Home Account, and the resulting direct benefits he has received from the services Comcast has provided to him, preclude him from evading his obligation to arbitrate his claim under equitable estoppel principles.[17]

> **1.      Plaintiff Accepted and Is Bound by the Subscriber Agreement by Using the Services.**

Plaintiff's undisputed use and enjoyment of Comcast services at the Shelton Home pursuant to the Shelton Home Account binds him to arbitration by the express terms of the Subscriber Agreement.  *See* Miriello Decl., Ex. C § 1 ("**You will have accepted this Agreement and be bound by its terms if you use the Services**…" (emphasis in original)); *see also id.* at § 7 ("[Y]ou are accepting this Agreement on behalf of all persons who use the Xfinity Equipment and/or Service(s) at the Premises . . . and you shall have sole responsibility for ensuring that all other users understand and comply with the terms and conditions of this Agreement and any applicable policies…").  Courts around the country, including this Court, have repeatedly found that a plaintiff's use of Comcast services binds them to the Comcast Subscriber Agreement, including its broad arbitration provision.[18]  *See, e.g.*, *Strange*, 2018 WL 6602072, at *4 ("Finally,

---

[17] Under the FAA, a disputed issue of material fact as to the formation of an arbitration agreement shall be resolved by trial.  *See* 9 U.S.C. § 4 (". . . . If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof. . . .").

[18] It is of no moment that Plaintiff did not sign the arbitration agreement because, "under the FAA, a signature is not required for an arbitration agreement to be enforceable."  *Morina v. Neiman Marcus Grp., Inc.*, No. 14-1394, 2014 WL 4933022, at *14 (E.D. Pa. Oct. 1, 2014) (citing

silence or inaction (*i.e.*, continued use of the service) demonstrates that the subscriber has consented to the agreement." (citing subscriber agreement)); *O'Neil*, 2019 WL 952141, at *3 (rejecting plaintiff's argument that a third-party imposter's purported opening and use of an account permitted her to avoid her arbitration agreement: "It is uncontested that Plaintiff used the Xfinity internet service after receiving the 2015 and 2017 Subscriber Agreements.  Because she used the service to which these agreements refer, she accepted Defendants' offer according to its exact terms."); *see also Schwartz v. Comcast Corp.*, 256 F. App'x 515, 518 (3d Cir. 2007) (enforcing arbitration agreement and explaining that, "[w]hether or not [plaintiff] received a copy of the subscription agreement, he *could not accept services he knew were being tendered on the basis of a subscription agreement without becoming bound by that agreement*." (emphasis added) (citing Restatement (Second) of Contracts § 23)).

The record amply demonstrates that Plaintiff not only used the service at the Shelton Home Account, but that he actively exercised significant control over the account.  *See supra*, at 5-7 (describing service call made by Plaintiff confirming Plaintiff's procurement of direct benefits flowing from Shelton Home Account).  He associated his telephone number with the Shelton Home Account, made service calls to Comcast in connection with the Shelton Home Account, and confirmed substantial use and control over the Shelton Home Account.  *See id.*

If there were any doubt as to Plaintiff's knowledge of the Subscriber Agreement and the binding arbitration provision therein, it is eliminated by Plaintiff's untimely attempt to opt out of the provision on behalf of the Shelton Home Account.  The timing of that purported opt-out—a mere four days after Plaintiff purported to opt out of arbitration for the fake account—further

---

9 U.S.C. § 2); *see also Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1369 (11th Cir. 2005) (internal citations omitted) ("[N]o signature is needed to satisfy the FAA's written agreement requirement… 'All that is required is that the provision be in writing.'").

shows that Plaintiff knew he was bound by the arbitration provision.  His attempt to clear the path for this litigation with a woefully belated opt-out attempt ultimately confirms that he is required to arbitrate his manufactured claims.  *See* Patel Decl. ¶ 9.  Plaintiff **cannot** "**accept services he knew were being tendered on the basis of a subscription agreement without becoming bound by that agreement**[.]" *Schwartz*, 256 F. App'x at 518 (emphasis added).  It follows that his claim should be sent to individual arbitration.

### 2.    Plaintiff is Equitably Estopped From Evading the Arbitration Provision.

Even if Comcast's arbitration provision did not apply to Plaintiff as a user of Comcast services (it does), well-settled principles of equitable estoppel would nevertheless prevent Plaintiff from avoiding arbitration.  Where, as here, a party "has reaped the benefits of a contract containing an arbitration clause," that party will be compelled to arbitration to the same extent as a signatory of the agreement.  *HealthplanCRM, LLC v. AvMed, Inc.*, No. 19-1357, 2020 WL 2028261, at *14 (W.D. Pa. Apr. 28, 2020) (quoting *Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 85 (3d Cir. 2010)).  State contract law governs the inquiry, *id.* at *14 (citation omitted), and "'Pennsylvania law allow[s] non-signatories to be bound to an arbitration agreement' by equitable estoppel 'when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement.'"  *Id.* (quoting *Griswold v. Coventry First LLC*, 762 F.3d 264, 271–72 (3d Cir. 2014) (alterations in original).  A party knowingly exploits a contract "by knowingly seeking and obtaining direct benefits from that contract."  *Id.* (quoting *Griswold*, 762 F.3d at 272).  As the court in *HealthplanCRM* explains, within this category of cases are those "involv[ing] non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract."  *Id.* (collecting cases).  "Courts have applied this theory of estoppel where non-

signatories to a contract seek to avoid arbitration clauses after accepting all manner of benefits flowing directly from signatories' performance of that contract." *Id.* (collecting cases, involving, *inter alia*, lower insurance rates, "the ability to fly under the French flag," "having custom-made Amkor chips made available," and "continuing to use the name 'Deloitte'"). The same result follows here.

Plaintiff knowingly sought and obtained benefits under the Subscriber Agreement by using the Comcast services provided under that agreement at the Shelton Home. Indeed, not only did Plaintiff knowingly use the Comcast services provided pursuant to the Subscriber Agreement, he exercised control over the Shelton Home Account by providing his wireless telephone number as a contact number, and seeking Comcast service support. In other words, "Plaintiff[] did more than just passively benefit from the services." *Montoya v. Comcast Corp.*, No. 15-02573, 2016 WL 5340651, at *4 (E.D. Cal. Sept. 23, 2016) ("[He] actively utilized the infrastructure of [Comcast]'s company by asking for additional [] measures [from Comcast].").[19] As a result, Plaintiff is equitably estopped from attempting to avoid the arbitration provision. *Id.*

Plaintiff actively sought and received direct benefits from the provision of services to the Shelton Home under the Subscriber Agreement, and affirmatively invoked the customer support services provided pursuant to that Agreement. He is therefore bound to arbitrate his claims. *Id.*; *see also HealthplanCRM*, 2020 WL 2028261, at *14–15 (compelling arbitration where defendant received a direct benefit flowing from the agreement that contained an arbitration provision);

---

[19] In *Montoya*, the court also analyzed whether plaintiffs' claims were intertwined with the contract, as it believed to be required by Ninth Circuit precedent. *See id.* at *5-6. There is no such requirement under Pennsylvania law, however. *See HealthplanCRM*, 2020 WL 2028261, at *14 (confirming that equitable estoppel may be applied solely where a third party has knowingly sought and obtained direct benefits from the contract containing an arbitration provision) (citing *Griswold*, 762 F.3d at 272).

*accord Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 274-75 (E.D.N.Y. 2019) (ordering husband's claims against Amazon to arbitration because the husband "knowingly accepted the benefit of [his wife's] contractual relationship with Amazon" and so "must also be held to the arbitration clause that governs that relationship").

## IV.    CONCLUSION

For the foregoing reasons, Comcast respectfully requests that the Court compel Plaintiff's claim to individual arbitration and stay this action pending the outcome of that arbitration.[20]

Respectfully submitted,

*/s/ Seamus C. Duffy*
Seamus C. Duffy (ID No. 52501)
Julie A. Busta (ID. No. 311933)
Akin Gump Strauss Hauer & Feld LLP
Two Commerce Square
2001 Market St., Suite 4100
Philadelphia, PA 19103
Tel: 215-965-1200
Fax: 215-965-1210
sduffy@akingump.com
jbusta@akingump.com

Attorneys for Defendants
Comcast Corporation and Comcast Cable
Communications, LLC

---

[20] Comcast's obligations to otherwise answer, plead, or move in response to Plaintiff's Complaint are similarly tolled during the pendency of this Motion.  *See, e.g.*, *Intravascular Research Ltd. V. Endosonics Corp.*, 994 F. Supp. 564, 567 n.3 (D. Del. 1998) ("Historically, motions to stay have been recognized as tolling the time period for answering a complaint:"); *see also BNY Licensing Corp. v. Isetan of Am. Inc.*, 206 B.R. 336, 340-41 (Bankr. S.D.N.Y. 1997); *Armendariz v. Ace Cash Express*, No. 13-0590, 2013 WL 3791438, at *4 (D. Or. July 19, 2013); *G.T.G. Constr. Co. v. Goel Servs., Inc.*, No. 12-1129, 2012 WL 3860590, at *2 (D.D.C. Sept. 5, 2012); *Intec USA, LLC v. Engle*, No. 05-0468, 2006 WL 753180, at *1 n.1 (M.D.N.C. Mar. 23, 2006).

**<ins>CERTIFICATE OF SERVICE</ins>**

I certify that on August 18, 2020, the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

Dated: August 18, 2020                                    /s/ *Seamus C. Duffy*